UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HARNOIS,

        Plaintiff,

   v.

WOODS HOLE OCEANOGRAPHIC
INSTITUTION, et al.,

        Defendants.

Civil Action No. 1:21-cv-10236-IT

**<u>MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

**INTRODUCTION**............................................................................................1

**BACKGROUND** ............................................................................................3

I.      Plaintiff's Criminal History.......................................................................3

II.     Plaintiff Is a Serial Litigator and Vexatious Litigant. ......................................4

III.    Plaintiff Has Filed Numerous Complaints Alleging the Same Harm. ...........4

IV.    Other Cases Arising Out of the Same UMass Allegations...........................5

V.     Plaintiff's Claims In This Case. ..............................................................7

**ARGUMENT** ................................................................................................8

I.      The Motion to Dismiss Standard...............................................................8

II.     Plaintiff's Defamation-Based Claims Are Barred by the Statute of Limitations. ...........9

III.    Plaintiff Should Be Judicially Estopped from Pursuing His Claims in this Case. ........13

IV.    Plaintiff is Defamation-Proof as to the Statements at Issue. ........................15

V.     Defendants' Alleged Statements Are Privileged..........................................16

VI.    Plaintiff's Claims for Interference with VA Benefits and Conspiracy Fail. ................19

VII.   Plaintiff Pleads No Facts to Support WHOI's Inclusion In This Suit...........................20

**CONCLUSION** ............................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
   374 F.3d 23 (1st Cir. 2004) .................................................................................13

*Amrak Prods., Inc. v. Morton*,
   410 F.3d 69 (1st Cir. 2005) ...................................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................8, 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 555 (2007) ..............................................................................................8

*Bowen v. Eli Lily & Co.*,
   408 Mass. (1990) ................................................................................................11

*Bratt v. Int'l Bus. Machines Corp.*,
   392 Mass. 508 (1984) .........................................................................................17

*Burroughs v. Commonwealth*,
   423 Mass. 874 (1996) .........................................................................................20

*Butler v. Adecco USA Inc.*,
   189 F. Supp. 3d 305 (D. Mass. 2016) ................................................................17

*Butler v. Balolia*,
   736 F.3d 609 (1st Cir. 2013) .................................................................................8

*Cambridge Plating Co. v. Napco, Inc.*,
   991 F.2d 21 (1st Cir. 1993) .................................................................................11

*Dew v. City of Bos.*,
   405 F. Supp. 3d 294 (D. Mass. 2019) ..................................................................8

*Doe v. Sanderson*,
   No. 16-12068-IT, 2018 WL 1586026 (D. Mass. Mar. 30, 2018) (Talwani, J.) ........................9

*Friedman v. Jablonski*,
   371 Mass. 482 (1976) .........................................................................................11

*Giragosian v. Ryan*,
   547 F.3d 59 (1st Cir. 2008) ...................................................................................8

*Global Naps, Inc. v. Verizon New England Inc.*,
    603 F.3d 71(1st Cir. 2010) ..............................................................................13

*Harnois v. Bill Gens Law Offices*,
    No. 1:20-cv-12154 (D. Mass.) (Gorton, J.)...................................................6

*Harnois v. Esch (Esch I)*,
    C.A. No. 14-0533 ................................................................................. *passim*

*Harnois v. Esch (Esch II)*,
    C.A. No. 15-3385 ..............................................................................................5

*Harnois v. Lamont*,
    83 Va. Cir. 473, 2011 WL 8964938 (2011) ...........................................4, 7

*Harnois v. Meehan*,
    No. 2184CV00083 (Suffolk Super. Ct.) .......................................................7

*Harnois v. Turner*,
    No. 2073CV00730 (Mass. Bristol Super. Ct.) ............................................6

*Harnois v. Univ. of Mass.*,
    No. 1:19-cv-10705 (D. Mass.) (Stearns, J.) ................................................1

*Harrington v. Costello*,
    467 Mass. 720 (2014) ..................................................................................9, 10

*Jackson v. Longcope*,
    394 Mass. 577 (1985) ................................................................................15, 16

*Kowalski v. Gagne*,
    914 F.2d 299 (1st Cir. 1990) .........................................................................8

*McKinney v. Waterman S.S. Corp.*,
    925 F.2d 1 (1st Cir. 1991) ..............................................................................8

*Monsarrat v. Zaiger*,
    No. 17-10356-PBS, 2018 WL 4232906 (D. Mass. Sept. 4, 2018) ........... *passim*

*Mullane v. Breaking Media, Inc.*,
    433 F. Supp. 3d 102 (D. Mass. 2020), *aff'd*, No. 20-1080 (1st Cir. Feb. 26,
    2021) ...................................................................................................................9

*Noonan v. Staples, Inc.*,
    556 F.3d 20 (1st Cir. 2009) ..........................................................................18

*RTR Techs., Inc. v. Helming*,
   815 F. Supp. 2d 411 (D. Mass. 2011) (Posner, J.), *aff'd on other grounds*, 707
   F.3d 84 (1st Cir. 2013) .................................................................................................11

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ..........................................................................................8

*Sheehan v. Tobin*,
   326 Mass. 185 (1950) .................................................................................................17

*Wenger v. Aceto*,
   451 Mass. 1 (2008) .....................................................................................................19

*Worcester Ins. Co. v. Fells Acres Day School, Inc.*,
   408 Mass. 393 (1990) .................................................................................................20

**Statutes**

M.G.L. c. 231, § 59H ........................................................................................................19

M.G.L. c. 231, § 92 ..........................................................................................................18

M.G.L. c. 260, § 4 ..............................................................................................................9

## <u>INTRODUCTION</u>

Publicly available information reflects that Plaintiff is a convicted felon and serial litigator who has filed at least two dozen lawsuits and was deemed a "vexatious" litigant by a Virginia court in 2011.  He has filed multiple other cases claiming vast conspiracies and defamation.  This is the fifth case Plaintiff has brought arising out of the same events that occurred at the University of Massachusetts at Dartmouth ("UMass") in 2016.

In the first such case, *Harnois v. Univ. of Mass.*, No. 1:19-cv-10705 (D. Mass.) (Stearns, J.) ("UMass Litigation" or "*Harnois I*"), Plaintiff claimed that, during his first year in UMass's graduate program for oceanography, UMass's Chancellor of Student Affairs, Ms. Cummings, learned that Plaintiff had a criminal history that he had not disclosed in his application; launched a "sham" Title IX investigation into his conduct; defamed him to UMass students, the Defendants in this case, and other schools; constructively expelled him; and prevented him from gaining admission to any other graduate program in his area of discipline, all because she had an anti-male bias.  *Harnois I*, Dkt. # 30, 3rd Am. Compl. ("TAC"),  Ex. 4 at ¶¶ 111-253.  Based on these allegations, Plaintiff survived a motion to dismiss and settled the case for nuisance value – approximately $70K.  *Harnois I*, Dkt. # 60, 92 (enforcing settlement).

Here, Plaintiff flip-flops, claiming that Defendants Woods Hole Oceanographic Institution ("Woods Hole"), Laela Sayigh, Michael Moore, and Alessandro Bocconcelli, all Woods Hole employees (collectively, "Defendants" or "WHOI") defamed Plaintiff *to UMass*.  In other words, after securing a settlement by claiming that UMass defamed him to WHOI, Plaintiff now alleges WHOI defamed him to UMass.

This is not the only glaring inconsistency in Plaintiff's various pleadings.  Plaintiff claims that Defendants' alleged defamation consisted of informing UMass about violent felonies for which Plaintiff was indicted in Massachusetts Superior Court.  The crimes were allegedly

1

committed against H. Carter Esch in 2012, in an apartment owned by her friends, Defendants Sayigh and Bocconcelli.  Although Plaintiff claims that Defendants' alleged defamation marred his reputation in his chosen field of oceanography, he had already alleged, in lawsuits he brought against Ms. Esch in 2014 and again in 2015, that Ms. Esch had ruined his reputation in the same field by falsely accusing him of violating a protective order that she had obtained against him. *See* Section III, *infra*.  And, while Plaintiff claims in this case that Defendants' alleged defamation caused his constructive expulsion from UMass in late 2016, Plaintiff, in a complaint he filed in Rhode Island in 2017, claimed that he was forced to withdraw from UMass due to mental anguish he suffered when the defendants in that case falsely accused him of violating a protective order obtained by another former girlfriend.

The inconsistent pleadings and contradictory theories reveal the true nature of this action: it is a meritless effort at extortion.  Indeed, Plaintiff has been explicit about his intentions.  He told counsel "[o]nly one claim must survive Rule 12(b)(6) to fulfill my initial goal of seeking discovery," and that, if he achieves that goal, "your hourly fees . . . will quickly deluge the amount for which I offer to settle."  *See* Defs.' Mem. in Supp. of Mot. for Protective Order (Dkt. # 31 at p. 8).

Fortunately, Defendants should not have to endure this case for long.  This case should be dismissed as a matter of law for several separate and independent reasons.

First and foremost, Plaintiff's claims are time-barred.  Plaintiff filed his complaint two years too late, as the alleged defamation occurred almost five years before filing, and Plaintiff has not pled, and cannot plead, allegations that are sufficient to invoke Massachusetts' "discovery rule."[1]

---

[1] Massachusetts law governs all of Plaintiff's counts, which derive from Plaintiff's defamation claim.

Second, having survived a motion to dismiss in the UMass Litigation by alleging one theory, Plaintiff should be judicially estopped from pursuing a contradictory theory here.

Third, Massachusetts law recognizes that some people are defamation-proof, based on their known bad acts, and Plaintiff is such a person.  He is a felon with a public record of convictions for abduction, assault and battery of women, multiple violations of protective orders obtained by women, and conspiracy to commit burglary, for which he has been incarcerated.  If that were not enough (it is), Plaintiff asserted, in a public pleading filed while he was taking classes at UMass, that his reputation had already been ruined in his area of study.

Finally, other deficiencies mar Plaintiff's Amended Complaint, including:

(a)   Defendants had a conditional privilege to share with other educational institutions information about the serious charges against Plaintiff, and Plaintiff has not pled any non-conclusory, non-speculative facts to support a finding that Defendants exceeded that privilege.

(b)   Plaintiff has not asserted a viable claim against Woods Hole:  he seeks to impose vicarious liability on Woods Hole for the purported intentional torts of its employees, but has not alleged, and cannot allege, that those employees, to the extent they committed intentional torts, were serving Woods Hole.

(c)   Plaintiff's claims for intentional interference with contractual relations with Veterans Affairs and conspiracy should be dismissed for the same reasons that this Court dismissed substantially similar claims in the UMass Litigation.

## **BACKGROUND**

### I.   **Plaintiff's Criminal History.**

The public record reflects that Plaintiff has been convicted of: assault and battery, *as amended from attempted malicious wounding*; abduction; conspiracy to commit burglary, *as amended from solicitation to murder*; numerous violations of protective orders; and numerous probation violations.[2]  He also was charged with and indicted for kidnapping, assault and battery

---

[2] *See* Exhibit 2, which contains a listing of criminal charges and convictions associated with Plaintiff by name.  The exhibits referenced herein (referenced as "Ex. __") are attached to the Declaration of Michael K. Murray.

with a dangerous weapon, armed burglary and assault, and violation of an abuse prevention order in connection with Ms. Esch, but those charges were ultimately nolle prossed because "an essential Commonwealth witness [was] unavailable" and "[t]he defendant is charged on related offenses in another jurisdiction better suited for prosecution." Ex. 3 at Dkt. # 52. Many of the charges against Plaintiff involve crimes against women – the charges in Massachusetts involved a girlfriend, and the convictions in Virginia involved a spouse. And numerous protective orders have been entered by women against Plaintiff in multiple jurisdictions.

## II.     Plaintiff Is a Serial Litigator and Vexatious Litigant.

In 2011, a Virginia Circuit Court ruled that Plaintiff was a vexatious litigant who had a predilection for filing "blunderbuss pleadings" that take "considerable time to slog through" and "voluminous motions" that are replete with allegations of "innumerable conspiracies, . . . adulterers and adulteresses." *Harnois v. Lamont*, 83 Va. Cir. 473, 2011 WL 8964938, at **2-4 (2011). Plaintiff has filed at least 24 lawsuits, almost half of which (11) were filed *after* he was found to be a vexatious litigant. *See* Ex. 1.

## III.    Plaintiff Has Filed Numerous Complaints Alleging the Same Harm.

In February 2014, less than a year before commencing classes at UMass, Plaintiff (who was in prison), filed suit in Massachusetts' Suffolk Superior Court against his ex-girlfriend, Ms. Esch, and her mother. Plaintiff claimed that Ms. Esch and her mother fraudulently obtained a protective order against him and then accused him of violating it. *Harnois v. Esch (Esch I)*, C.A. No. 14-0533, Ex. 5, at ¶¶ 9, 52. Plaintiff also claimed that Ms. Esch, who was a Ph.D. candidate in a joint MIT/WHOI program, slandered him to "MIT/WHOI staff" and "discredit[ed]" his "reputation in the oceanographic academic community." *Id.*, ¶¶ 32, 37-38, 63. The case was dismissed for failure to effectuate service. *Esch I*, No. 14-0533, Dkt. # 7.

By separate complaint filed in Suffolk Superior Court on November 6, 2015 (two months

4

after he began a master's program at UMass and five months before the alleged defamation

here), Plaintiff again sued Ms. Esch, asserting similar allegations and yet another claim for

defamation. *Harnois v. Esch (Esch II)*, C.A. No. 15-3385, Ex. 6. Plaintiff specifically alleged

that Ms. Esch's statements to others about Plaintiff's protective order violation "damaged his

reputation" in a way that "interfered with his ability to enroll in a Ph.D. program at MIT *and*

*other universities*." *Id.*, ¶¶ 9-12, 14-15 (emphasis added). This case was also dismissed for

failure to effectuate service. *Esch II*, No. 15-3385, Dkt. # 3.

In July 2017, Plaintiff filed, in Rhode Island state court, a voluminous complaint

claiming that 125 defendants engaged in a broad-ranging conspiracy against him in 2016, the

same year that is the focus of his Complaint in this case. *Harnois v. Courtney Schick Kellogg,*

*et al.*, Providence/Bristol Superior Court, PC-2017-3455, Ex. 7, at 1. Plaintiff alleged that the

defendants' actions – which included (1) reporting to the police that Plaintiff had violated a

protective order by threatening a woman and (2) creating a Facebook page, on November 24,

2016, that posted his "mugshots" and identified his criminal record – caused him severe harm

that included his "*withdraw[al] from graduate school* and resulted in panic attacks, headaches,

insomnia, grinding of teeth." *Id.* at ¶¶ 61 & 192 (emphasis added). In short, Plaintiff claimed

the precise harm in Rhode Island that he now alleges in this case. FAC, ¶ 189.

**IV.   Other Cases Arising Out of the Same UMass Allegations.**

On April 12, 2019, Plaintiff filed a complaint with 567 numbered paragraphs and 19

counts against UMass. *See Harnois I*, No. 1:19-cv-10705, Dkt. # 1. That complaint referenced

three of the four WHOI Defendants. *See id.*, ¶¶ 37, 225, 396, 405, 444 (Moore); ¶¶ 36-37

(WHOI), ¶ 242 (Sayigh). In a nutshell, Plaintiff claimed that, in the spring of 2016, Cynthia

Cummings, UMass's Chancellor of Student Affairs, and Scott Webster, UMass's Director of

Graduate Studies and Admissions, discussed Plaintiff's failure to disclose his criminal

convictions on his application.  TAC, ¶¶ 3, 07-08, Ex. 4.  Plaintiff claimed that, after that discussion, UMass (i) launched a "sham" Title IX investigation, (ii) sought to induce students to file false reports against him, (iii) defamed him, (iv) interfered with his advantageous relationships (including with WHOI), and (v) constructively expelled him from the university, causing him to become a pariah in his chosen area of academic discipline (oceanography) and to suffer severe emotional distress.[3]  TAC at ¶¶ 1-8, 100-518.  Plaintiff further alleged that, in committing these wrongful acts, UMass was motived by an anti-male bias and a desire to show federal funding authorities that UMass did not tolerate sexual harassment.  *See, e.g.*, *id*. at ¶¶ 74-79, 86-100.

The Court ruled that certain of Plaintiff's claims survived UMass's Rule 12(b)(6) motion to dismiss.[4]  Mem. & Order, *Harnois I*, No. 1:19-cv-10705, Dkt. # 60, at 1-3, 12-13, 15-17. Plaintiff then settled the case for approximately $70,000, but not before challenging the settlement after reporting to the Court that the case had been settled.  *See Harnois I*, No. 1:19-cv-10705, Dkt. ## 92 and 101.

Shortly after settling his case against UMass and before filing his Complaint in this case, Plaintiff filed several other suits arising out of the same set of events at UMass:

- On October 22, 2020, Plaintiff filed a complaint in Massachusetts state court against a UMass professor whom he claimed conspired with UMass in retaliation for Plaintiff's prior accusation that the professor had tolerated cheating in his class (*Harnois v. Turner*, No. 2073CV00730 (Mass. Bristol Super. Ct.));

- On December 2, 2020, Plaintiff filed a malpractice suit against the attorney who represented him in the Title IX proceeding, claiming that he wrongly advised Plaintiff that he had no viable damages claim (*Harnois v. Bill Gens Law Offices*, No. 1:20-cv-12154 (D. Mass.) (Gorton, J.)); and

---

[3] Plaintiff began taking courses in September of 2015; he therefore had not been at UMass for long before drawing the attention of UMass's administration.  TAC, ¶ 35, Ex. 4.

[4] UMass did not raise the statute of limitations issue because, unlike in this case, Plaintiff had filed his UMass complaint within three years of the events in question.

- On January 14, 2021, Plaintiff filed a lawsuit against UMass under the Massachusetts public records statute (*Harnois v. Meehan,* No. 2184CV00083 (Suffolk Super. Ct.)).

## V.    Plaintiff's Claims In This Case.

Plaintiff filed the original Complaint in this case on February 11, 2021, an amended complaint on April 27, 2021 (Dkt. ## 52 & 53), and the "First Amended Complaint" ("Amended Complaint" and "FAC") on April 28 (though it contained numerous additional amendments to the complaint filed the day prior).  The FAC asserts essentially the same allegations that Plaintiff previously asserted against UMass, with two exceptions.

First, Plaintiff has flipped the roles of WHOI and UMass.  Whereas Plaintiff contended in the UMass Litigation that Ms. Cummings set out to "rid" UMass of Plaintiff and defame him to others within the academic community upon learning of Plaintiff's criminal *convictions* (TAC, ¶¶ 1-8, 107-08), Ex. 4, Plaintiff now contends that Ms. Cummings set out to do so after learning *from* Defendants about the criminal *charges* involving Ms. Esch (FAC, ¶ 4).  Relatedly, whereas Plaintiff previously blamed UMass for its conduct against him and for defaming him to other universities (*see, e.g.*, TAC, ¶¶ 5, 117, 385-86), Plaintiff now blames Defendants for the very same things.  There is no legitimate explanation for these different theories:  Plaintiff had precisely the same facts in April 2019 that he has now.

Second, in this case, unlike the UMass case, Plaintiff asserts several gratuitous and salacious allegations against Ms. Esch, a non-party, including detailed and highly personal information regarding her alleged sex life and medical issues.  FAC, ¶¶ 52-58.  They are eerily consistent with the Virginia Circuit Court's observation regarding Plaintiff's preoccupation with "innumerable conspiracies, . . . adulterers and adulteresses."  *Harnois*, 2011 WL 8964938, at *3.

Considered together, Plaintiff's pleadings reflect that he harasses women to a point where they obtain protective orders against him, and he then sues them and their supporters for

7

defamation.  This Court need not tolerate such abuse of women and abuse of process:  this case has no merit and should be dismissed in its entirety.

## ARGUMENT

### I.      The Motion to Dismiss Standard.

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, Plaintiff's allegations must "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 570 (2007), and show "more than a sheer possibility of success."  *Butler v. Balolia*, 736 F.3d 609, 616 (1st Cir. 2013) (citation omitted).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained that "[p]lausible" means something "more than a mere possibility," and gauging a pleaded situation's plausibility is a "context-specific" job that compels the Court "to draw on its *judicial experience and common sense*."  *Id*. at 679 (emphasis added); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (Court should disregard conclusory or speculative allegations).

In evaluating a Rule 12(b)(6) motion, the Court may also consider matters of which it may take judicial notice, including relevant filings and dockets in other cases.  *See, e.g.*, *Dew v. City of Bos.*, 405 F. Supp. 3d 294, 298 (D. Mass. 2019) (court may consider dockets and "documents from prior state court adjudications" when ruling on motion to dismiss); *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (same); *cf. McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 5 (1st Cir. 1991) ("[w]e also take judicial notice of the proceedings in the bankruptcy court, and the documents filed therein . . . ."); *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

Notably, all of Plaintiff's claims are derivative of his defamation claim,[5] and therefore fail for the same reasons the defamation claim fails.  *See, e.g.*, *Amrak Prods., Inc. v. Morton*, 410 F.3d 69, 72 (1st Cir. 2005) ("Given appellants' failure to state a defamation claim, the court [properly] dismissed the derivative claims"); *Mullane v. Breaking Media, Inc.*, 433 F. Supp. 3d 102, 113 (D. Mass. 2020) ("Mullane's tortious interference claims are simply recycled versions of his defamation claim and cannot succeed."), *aff'd*, No. 20-1080 (1st Cir. Feb. 26, 2021).

## II.    Plaintiff's Defamation-Based Claims Are Barred by the Statute of Limitations.

As this Court has recognized, "[a] statute of limitations defense can prevail at the dismissal stage, provided that the facts supporting the defense are clear on the face of plaintiff's pleading."  *Doe v. Sanderson*, No. 16-12068-IT, 2018 WL 1586026, at *3 (D. Mass. Mar. 30, 2018) (Talwani, J.) (internal quotation marks and citation omitted).  That is the case here.

Under Massachusetts law, "[a]n action for defamation must be commenced only within three years after the cause of action accrues."  *Harrington v. Costello*, 467 Mass. 720, 725 (2014); *see also* M.G.L. c. 260, § 4.  Further, "the general rule is that the cause of action accrues, and the statute of limitations begins to run, on publication of the defamatory statement," which occurs when the defamatory statement is "communicated to a third party."  *Id*.  Here, Defendants' alleged defamation occurred in 2016 (*see* FAC, ¶¶ 100-185), which is almost five years before Plaintiff filed his Complaint.

Plaintiff purports to invoke the "discovery rule," but it does not apply here.  In order to invoke the discovery rule, which applies only to "inherently unknowable wrongs," the *plaintiff*

---

[5] *See* Count I (defamation); Count II at ¶ 262 (interference with contractual relations with UMass, based on the FAC's prior allegations); Count III at ¶ 291 (same, but claiming interference with relations with Veterans Affairs); Count IV at ¶ 299 (same, but claiming interference with relations with Defendant Moore); Count V at ¶ 314 (same, but claiming interference with relations with third-parties); Count VII at ¶¶ 33-34 (aiding and abetting based on "defam[ation]"); Count VII (the second time) at ¶ 352 (civil conspiracy based on "defamation").  Plaintiff dismissed a promissory estoppel claim (Count VI) at the scheduling conference. Dkt. # 60.

"has the burden of establishing facts that take him outside the statutory three-year limitations period." *Harrington*, 467 Mass. at 725.  Pursuant to the discovery rule, "a cause of action accrues when the plaintiff discovers *or with reasonable diligence should have discovered* that (1) he has suffered harm; (2) his harm was caused by the conduct of another; and (3) the defendant is the person who caused the harm." *Id*. at 727.

The case of *Monsarrat v. Zaiger*, No. 17-10356-PBS, 2018 WL 4232906 (D. Mass. Sept. 4, 2018) is on point.  In *Monsarrat*, Judge Saris adopted a report and recommendation that concluded that plaintiff's claim for defamation failed because, among other reasons, the alleged defamation occurred beyond the limitations period and the plaintiff failed to allege sufficient facts to show that, with the exercise of due diligence, the defendant's identity was "unknowable." *Id*. at *8.  The decision specifically notes that the plaintiff, through "reasonable diligence," such as by commencing a "John Doe suit" and issuing a subpoena to a party that re-published the defamation, could timely have ascertained the statement's original source. *Id*.

In this case, Plaintiff has not pled "facts that take him outside the statutory three-year limitations period."  467 Mass. at 725.  For instance, he does not allege, with non-speculative facts, that he could not, within three years of the alleged defamation, have acquired the information he now has.  To the contrary, Plaintiff alleges that he learned the facts necessary to bring this lawsuit in the spring of 2019, by, among other things, taking a few minutes to pick up the phone and call Defendants Moore and Sayigh.  FAC, ¶¶ 210-11.  Plaintiff has identified no legitimate reason why he – or the attorney who represented him at the time – could not or should not have had the same conversations three years earlier in 2016.[6]  Indeed, Plaintiff admits that it

---

[6] Plaintiff's assertion that he was deterred from making the same phone calls in 2016 that he made in 2019 by "threat[s] of repercussions" (FAC, ¶ 17) is without basis because (1) Plaintiff had counsel who could have protected him from any such threats; and (2) in all events, Plaintiff claims to have been constructively expelled from the

was an "epiphany," not new facts, that led him to call the Defendants.  FAC, ¶ 205.  "The [discovery] rule does not suspend the running of the limitations period pending confirmation of the plaintiff's injury or its cause, but simply stops the clock until the occurrence of 'an event or events . . . that were reasonably likely to put the plaintiff on notice that someone *may* have caused her injury.'"  *Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 28–29 (1st Cir. 1993) (quoting *Bowen v. Eli Lily & Co.,* 408 Mass. at 207, 557 (1990) (emphasis added)).

Moreover, just as in *Monsarrat*, Plaintiff here failed to allege facts to show that, with the exercise of reasonable diligence, the Defendants' identities were "unknowable" during the limitations period.  Indeed, as in *Monsarrat*, Plaintiff could have commenced a "John Doe" suit, or, even more easily, could have added a "John Doe" defendant to his earlier-filed case against UMass.  Plaintiff also could have issued a subpoena or taken other discovery in the UMass case to determine the alleged source of the "defamation."  But, instead, Plaintiff did nothing for two more years.

Further, as a matter of black letter law, Plaintiff's contention that his attorney misled him into sitting pat by advising him that he did not have a viable damages claim (FAC, ¶¶ 202-03) does not toll the limitations period.[7]  *RTR Techs., Inc. v. Helming*, 815 F. Supp. 2d 411, 423 (D. Mass. 2011) (Posner, J.), *aff'd on other grounds*, 707 F.3d 84 (1st Cir. 2013) (where plaintiffs filed their case beyond the limitations period because their attorney told them they did not have a viable claim, plaintiffs' only remedy would be a legal malpractice claim).

---

UMass by the end of 2016 (FAC, ¶ 196), and therefore there were no further "repercussions" to be "threatened" at that point.  Plaintiff's contention that the redacted version of UMass's Title IX report, which was filed in the UMass litigation, "tended to confirm that the defamation of Defendants triggered and continued the Title IX investigation" (FAC, ¶ 220) is baseless:  the report says nothing about Plaintiff's criminal history, and instead addresses only his conduct at UMass, and the comments from "several students and faculty members" that his interactions with them were "overly personal," "aggressive," "in your face," and "unwelcome."  *See* Ex. 10 at Section IX.

[7] *Cf. Friedman v. Jablonski*, 371 Mass. 482, 486 (1976) (where a reasonable investigation from an attorney would have revealed plaintiff's cause of action, plaintiff may not invoke the discovery rule).

In addition to all of this, Plaintiff alleges that Ms. Cummings informed Plaintiff, on May 4, 2016, that "she learned from others of Plaintiff's undisclosed criminal history." (FAC, ¶ 107).[8]  From the face of Plaintiff's Complaint, it is clear that the Plaintiffs should have known that the "others" included Defendants.  Specifically, Plaintiff alleges that: (1) his area of academic discipline is "incestuous since most relevant researchers have conducted studies together" (FAC, ¶ 2); (2) "[t]he researchers and scientists [in his field] have the formal and informal institutional authority and responsibility for molding . . . Ph.D. candidates . . . or alternatively washing out the indistinguishable students" (*id*. at ¶ 3); (3) Plaintiff, Ms. Esch, and Defendants Sayigh and Bocconcelli, who all participated in the same small academic community, had known each other since at least 2012 (*id.*, ¶ 49); (4) Defendant Sayigh was Ms. Esch's undergraduate advisor and, together with Defendant Bocconcelli, "treated Esch as an adopted daughter" and allowed her to live in an apartment in their garage (*id.*, ¶¶ 49, 51); (5) Defendants Sayigh and Bocconcelli were "intimately involved in the investigation against Plaintiff [and] receiv[ed] regular updates" of the investigation (*id.*, ¶ 67); (6) Defendant Bocconcelli "became enraged" when he and Plaintiff "met eyes" while Plaintiff was visiting WHOI early in 2016 (*id.*, ¶¶ 5, 77-78); (7) Defendants Sayigh and Bocconcelli were motivated to ruin Plaintiff's reputation based on the incident involving Ms. Esch (*id.*, ¶¶ 65, 69, 70, 71, 90); and (8) Defendant Moore ceased speaking to Plaintiff in March of 2016 (*id.*, ¶ 81).

Based on these allegations in the Amended Complaint itself, Plaintiff, at a minimum, could have named UMass and "John Doe" defendants in a complaint in 2016.  *See Monsarrat*, 2018 WL 4232906, at *8.  Or, through the exercise of reasonable – even minimal – diligence, he

---

[8] In response to Defendants' initial motion to dismiss, Plaintiff deleted a specific allegation that Ms. Cummings had told him that she had communicated *with Woods Hole* about his criminal history.  Compl. ¶ 75.  As explained *infra* at 14-15, Plaintiff should be estopped from undoing this admission.  Nevertheless, the face of the FAC reveals that Plaintiff has not satisfied the discovery rule.

easily could have identified those who may have had discussions with UMass, and he would have landed upon Defendants within the limitations period. *See id*.

In short, the face of Plaintiff's Complaint reveals that Plaintiff knew or should have known in the spring of 2016 that UMass had spoken Defendants about Plaintiff's undisclosed criminal history. To the extent Plaintiff lacked knowledge about the specific participants in, or content of, such communications, it was because Plaintiff did not "attempt[], diligently or otherwise, to discover" such information. *Id*. Indeed, Plaintiff would have identified such information through the exercise of even less diligence than that deemed insufficient in the *Monsarrat* case. Accordingly, just as in *Monsarrat*, Plaintiff's claims against Defendants are time-barred as a matter of law.

### III. Plaintiff Should Be Judicially Estopped from Pursuing His Claims in this Case.

The First Circuit has held that the "basic elements" of judicial estoppel are (1) "the assertion of inconsistent positions" and (2) "judicial acceptance of the original position." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 35 (1st Cir. 2004). Judicial estoppel exists "to safeguard the integrity of courts by preventing parties from improperly manipulating the machinery of the judicial system." *Id*. at 33; *see also Global Naps, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 91(1st Cir. 2010). "[I]n a prototypical case, judicial estoppel applies when "a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage," including where the court allows a pleading to survive a motion to dismiss based on that party's position. *Alt. Sys.*, 374 F.3d at 33-34.

In the UMass Litigation, Plaintiff – knowing all the facts that form the basis of his Complaint here – alleged that UMass's Ms. Cummings, acting with the intention of removing Plaintiff from UMass's campus because he was a "male student with a conviction," launched a "sham" Title IX investigation, imposed unreasonable sanctions against him, and defamed him to

WHOI and others.  TAC, ¶¶ 321, 117, 385-86, Ex. 4.  Plaintiff argued, in opposing UMass's

motion to dismiss, that these allegations asserted "specific sufficient facts that Defendants took

action against him because of his gender."  Plaintiff's Memorandum in Opposition to

Defendants' 12(b)(1) and 12(b)(6) Motions to Dismiss (Dkt. # 56) ("Plaintiff's MTD Opp.")[9] at

11, 13.  Accepting Plaintiff's argument and allegations, Judge Stearns ruled that Plaintiff had

stated viable Title IX claims, as well as viable claims for intentional interference with his

relationship with Woods Hole and others.  Mem. & Order on Defendants' Rule 12(b)(6) Motion

to Dismiss (Dkt. # 60) ("MTD Decision"),[10] at 12, 13, 14, 15-17, 27-28.

Plaintiff cannot have it both ways.  He cannot tell the Court in one case that UMass

defamed him because of its anti-male bias and his criminal convictions, settle and receive

$70,000, and then turn around and argue, "no, it was actually WHOI, not UMass, that harmed

me, and it was the charges concerning Ms. Esch, and not criminal convictions, that caused

UMass to act."  Plaintiff, having survived a motion to dismiss in the UMass Litigation based on

the theory he advanced in that case, should be estopped from pursuing a contradictory theory

here.  Compl, ¶ 75, 80.  This is especially true because Plaintiff has not alleged that he has

learned any new facts that would justify the radical departure from his prior allegations.

Plaintiff also should be denied the dishonest gambit of his Amended Complaint where, in

three places, he specifically deleted admissions that he had personal knowledge, in 2016, that

other institutions, including Woods Hole, were involved in UMass's investigation.  Defendants

attach Exhibit 11, which shows in redline the blatant changes Plaintiff has made to try to dodge

the fact that his claims are time-barred.  For instance, Plaintiff alleged in his original complaint

that Ms. Cummings informed him at the May 4, 2016 meeting that she had "learned from other

---

[9] Attached hereto as Ex. 8.
[10] Attached hereto as Ex. 9.

universities – *Woods Hole* – of Plaintiff's undisclosed criminal history and that anyone in his field will soon know." Compl. ¶ 75 (emphasis added). In the FAC, Plaintiff removed just the words "other universities – Woods Hole," replacing them simply with "others."[11] FAC ¶ 107. Plaintiff also deleted Ms. Cummings's statements to Plaintiff that "mentors in local universities" were the source of her information, *compare* Compl. ¶ 71 *with* FAC ¶ 102, and that "they received the information from universities that were pressuring UMass to investigate plaintiff." *Compare* Compl. ¶ 77 *with* FAC ¶ 105.[12] Plaintiff's claims are clearly time-barred even without these admissions. But Plaintiffs' disingenuous effort to alter *factual* allegations to avoid dismissal underscores the frivolous nature of his action.

## IV.     Plaintiff is Defamation-Proof as to the Statements at Issue.

Massachusetts recognizes the concept of a defamation-proof plaintiff. In *Jackson v. Longcope*, 394 Mass. 577, 578 (1985), the Supreme Judicial Court held that, as a matter of law, even if a newspaper article were libelous, the plaintiff's "considerable criminal record, as to which there is no dispute of material fact, bars him from recovering damages for libelous statements concerning his criminal activities." Plaintiff, having been convicted of several serious felonies and charged with many others, *and having alleged in prior cases that his reputation has already been ruined within his area of academic discipline*, is also defamation-proof as to the specific defamation he alleges here.

Plaintiff contends that the information concerning the charges involving Ms. Esch resulted in his constructive expulsion from UMass and his inability to gain admittance to other schools that offer doctorates in oceanography. FAC, ¶¶ 2-4. But, before the alleged defamation

---

[11] Again, under *Monsarrat*, merely acknowledging that Ms. Cummings learned of such "defamation" from "others" put the burden on Plaintiff to discover the identities of those "others" within the limitations period.
[12] Plaintiff removed this last allegation only *after* the Court ordered him to refile a previous version with a correct title. As Plaintiff did not seek leave to make this change, it should be disregarded.

occurred, it already was a matter of public record that Plaintiff had been convicted of multiple violent felonies and charged with several other crimes, including his indictment for the alleged crimes involving Ms. Esch.  And, as Plaintiff has *affirmatively pled*, any graduate program he applied to would necessarily learn of his criminal record, because "Plaintiff would have had to write a disclosure statement of his criminal history per admissions requirement."[13] FAC, ¶ 91. Moreover, Plaintiff already had claimed (1) in his first complaint against Ms. Esch in 2014, that she "discredit[ed]" Plaintiff's "reputation in the oceanographic academic community" (Ex. 5 at ¶¶ 32, 37-38, 63), and (2) in his second complaint against Ms. Esch filed in November 2015 – *while he was enrolled at UMASS and less than five months before the alleged defamation at issue here* – that she had publicized her charges against Plaintiff, which "damaged his reputation" and "interfered with his ability to enroll in a Ph.D. program at MIT and other universities" (Ex. 6, ¶¶ 14-15).[14]  Plaintiff's publicly accessible criminal record and criminal charges, his acknowledgement that he would have to disclose his criminal record to any school to which he applied, and his prior assertions that his reputation already had been ruined "in the oceanographic academic community," confirm that Plaintiff is defamation-proof as to the type of defamation he has alleged here.  *Jackson*, 394 Mass. at 580.

## V.    Defendants' Alleged Statements Are Privileged.

Under Massachusetts law, "[a] defamatory communication is protected by a conditional common law privilege provided the publisher and recipient share some legitimate mutual interest

---

[13] Plaintiff effectively acknowledges that his failure to disclose, on his written application to UMass, his prior criminal convictions, and the seriousness of those convictions, were enough, by themselves, to preclude his admission elsewhere.  For example, he claims that Tom Schultz of Duke explained that Duke could not even accept him to Professor Nowacek's open summer classes for undergraduates because "We have to keep our people safe. You should have informed Doug (Nowacek) you had a conviction."  FAC, ¶ 135.

[14] On top of this, in his Rhode Island Complaint, Plaintiff alleged that other defendants had, on November 24, 2016, published a Facebook page entitled "Justified Revenge," that included "mugshots" of Plaintiff and his "criminal history.  Ex. 7 at ¶ 61.  This underscores the ready availability of information about Plaintiff's criminal history.

'reasonably calculated' to be served by the communication." *Catrone*, 929 F.2d at 887. The purpose of the privilege is "to promote the free flow of information to further a legitimate private or public interest." *Id*. (quoting *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 515 n.11 (1984)). The privilege's scope is "coterminous with the legitimate mutual interest reasonably calculated to be served by the communication." *Id*. at 888 (citing *Sheehan v. Tobin*, 326 Mass. 185 (1950)). "The conditional privilege embraces communications reasonably calculated to advance a legitimate public or private interest common to publisher and recipient." *Id*. at 890. The privilege can be lost if the statement is reckless, unnecessary, or known to be false. *Butler v. Adecco USA Inc.*, 189 F. Supp. 3d 305, 312 (D. Mass. 2016) (granting motion to dismiss defamation claim when statement was protected by conditional employer privilege and plaintiff failed to adequately allege statement was reckless, unnecessary, or known to be false).

In *Catrone*, the First Circuit held that entities involved in the race track industry had an interest in sharing information about individuals who "might threaten the integrity of thoroughbred racing in Massachusetts," and therefore had a privilege to convey such information about the plaintiff. 929 F.2d at 888. The Court further ruled that, even though the information at issue included inaccuracies and the defendants would have exceeded the privilege if they had spread the information with "actual malice," the defendants acted within the scope of the privilege because they had a "firm belief" that the plaintiff "was bad for racing." *Id*. at 890.

As members of an academic community that Plaintiff himself described as "incestuous since most relevant researchers have conducted studies together" (FAC, ¶ 2), Defendants had an obvious interest in ensuring that the professors and students within their community were aware of potential predators in their midst. Certainly, the interest in protecting the safety of others is no less significant than protecting the "integrity of thoroughbred racing." Defendants, therefore,

had a conditional privilege to disclose facts indicating that Plaintiff may pose a threat to others, to enable those with responsibility to take appropriate action to investigate and protect their faculty and students.  Even according to Plaintiff's allegations, Defendants exercised this privilege discretely, conveying the information to academics within their field of study.  *See* FAC, ¶¶ 79, 83, 96).  Having alleged that "[t]he researchers and senior scientists have the formal and informal institutional authority *and responsibility* for molding the . . . Ph.D. candidates into scientists . . . or alternatively washing out the indistinguishable students" (FAC, ¶ 3 (emphasis added)), Plaintiff cannot dispute that Defendants had a right, if not a duty, to alert their fellow academics to potentially dangerous students.[15]

To be sure, Plaintiff has asserted, in conclusory fashion, that Defendants acted with malice in informing UMass that Plaintiff had committed crimes against Ms. Esch.  But such conclusory allegations should not be credited without supporting facts.  *Catrone*, 929 F.2d at 888-90.  In an effort to establish malice, Plaintiff has pled the following:  (1) Bocconelli and Sayigh "treated Ms. Esch as an adopted daughter" (FAC, ¶ 51); (2) the alleged crimes took place "in their home – just rooms away from their children" (*id*., ¶ 70); and (3) the incident "forced [Bocconcelli] to abandon his extensively planned and costly scientific research deployment to . . . South Pacific/Antarctica, for which he blamed Plaintiff" (*id*., ¶ 65).  These allegations, however, do not support a finding that Defendants believed Plaintiff to be innocent of the charges and nonetheless wanted to harm him.  At best, they show that Defendants Bocconcelli may have harbored strong resentment towards Plaintiff, *but only if they believed that he was*

---

[15] Plaintiff, citing *Noonan v. Staples, Inc.*, 556 F.3d 20, 30 (1st Cir. 2009), erroneously asserts that Defendants may be liable for conveying truthful information with malice.  *See* FAC, ¶¶ 80, 83, 85, 96.  *Noonan*, however, addressed libel, not slander, and applied M.G.L. c. 231, § 92, which provides that truth is not a justification for *libel* where actual malice is proved.  Here, Plaintiff claims that Defendants committed oral (slander), not written (libel), defamation.  Accordingly, truthful assertions (like that Plaintiff was charged with committing violent crimes against Ms. Esch or that Defendants believed that Plaintiff committed the crimes) would not be actionable here, regardless whether they are also privileged.

*guilty as charged. See Iqbal*, 556 U.S. at 681-82 (ruling that Plaintiff's allegation of discriminatory intent was implausible because the Plaintiff's non-conclusory allegations permitted other "more likely explanations").  And, if they believed he was guilty as charged, they could not have acted with malice in conveying their belief to other academics.

Finally, there is a strong public policy in encouraging those in academic settings, like Defendants, to discretely share information that is objectively relevant to campus safety.  If simply asserting, through non-sensical allegations, that academics and university professors who provide almost entirely public criminal record information to their peers at sister institutions have done so with "malice" is sufficient to expose defendants to the significant burden and expense of discovery and summary judgment briefing, the chilling effect on such communications would be substantial, to the detriment of public safety and academic freedom.[16]

## VI.    Plaintiff's Claims for Interference with VA Benefits and Conspiracy Fail.

In Count III, Plaintiff purports to assert a claim for intentional interference with his contractual relations with Veterans Affairs, and in Count VII, Plaintiff purports to assert a conspiracy claim.  Nearly identical claims were dismissed in the UMass Litigation, where the Court ruled that (1) "[Plaintiff] has not pled facts to support an inference that defendants knowingly induced the VA to break its contract with [him]" (MTD Decision, Dkt. # 60 (Ex. 9) at 35); and (2) "[c]ivil conspiracy is a very limited cause of action in Massachusetts," and "Harnois

---

[16]  Similar values are embodied in the Massachusetts Anti-SLAPP statute, M.G.L. c. 231, § 59H.  Fundamentally, Plaintiff is seeking to punish, five years after the fact, Defendants for allegedly requesting that a government entity (UMass) take some action with respect to Plaintiff, investigatory or otherwise.  Just like a prototypical SLAPP suit, the only realistic outcome of Plaintiff's case, if it proceeds, is that private citizens will become more skittish about sharing potentially relevant information with organizations duty-bound to protect their students.  *See Wenger v. Aceto*, 451 Mass. 1, 4 (2008) ("A SLAPP suit generally has no merit; the plaintiff's objective is not to win, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech, and to deter common citizens from exercising their political or legal rights or to punish them for doing so.").

does not plead facts sufficient to infer that defendants agreed to act together with the purpose of injuring him" (*id*. at 34 & 36). The same reasoning applies here.

## VII.  Plaintiff Pleads No Facts to Support WHOI's Inclusion In This Suit.

Separate and apart from all the foregoing reasons as to why Plaintiff's claims against Defendants fail, Plaintiff's claim against Woods Hole should be dismissed because he does not allege any misconduct by Woods Hole itself. The thin reed by which Plaintiff seeks to hold Woods Hole liable is his bald assertion that Defendants Moore, Sayigh, and Bocconcelli were acting in their "individual and official capacities" in conveying the allegedly defamatory information. *See, e.g.*, FAC, ¶¶ 234 & 236. But to impose liability against an employer for the conduct of its employees, the plaintiff must plead facts showing that the employees' conduct was "of the kind [they were] employed to perform," that it "occur[ed] substantially within the authorized time and space limits," and that it was "motivated, at least in part, by a purpose to serve the employer." *Burroughs v. Commonwealth*, 423 Mass. 874, 877 (1996) (internal quotations and citations omitted). An employer is not liable for the intentional torts of employees where those torts were not committed to serve the employer. *See Worcester Ins. Co. v. Fells Acres Day School, Inc.*, 408 Mass. 393, 404-05 (1990).

Plaintiff has pled no facts that would support a conclusion that Defendants Moore, Sayigh or Bocconcelli committed any intentional tort against Plaintiff in order to serve WHOI. *Worcester*, 408 Mass. at 405 (finding no vicarious liability where the "acts obviously were not 'of the kind [the employees were] employed to perform,' nor were they 'motivated, at least in part, by a purpose to serve the employer.'").

## CONCLUSION

For the foregoing reasons, all counts asserted against Defendants should be dismissed.

Dated: May 12, 2021

Respectfully submitted,

*/s/ Roberto M. Braceras*
Roberto M. Braceras (BBO # 566816)
Michael K. Murray (BBO # 563804)
Tucker DeVoe (BBO # 693426)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
rbraceras@goodwinlaw.com
mmurray@goodwinlaw.com
tdevoe@goodwinlaw.com

*Counsel for Defendants Woods Hole
Oceanographic Institution, Laela Sayigh,
Michael Moore, and Alessandro Bocconcelli*

## CERTIFICATE OF SERVICE

I, Roberto M. Braceras, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on May 12, 2021.

*/s/ Roberto M. Braceras*